UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ANTHONY P. FALCO,

    *Plaintiff,*

v.

DAWN ZIMMER, et al.,

    *Defendants.*

Civil Action No. 13-1648

OPINION

**THIS MATTER** comes before the Court by way of Defendants Dawn Zimmer, the City of Hoboken, New Jersey, and Jon Tooke's (collectively, "Defendants") motion to dismiss Plaintiff Anthony Falco's Third Amended Complaint ("TAC"). Dkt. No. 103. In this case, Plaintiff Anthony Falco, the former Hoboken Chief of Police, alleges constitutional and state law violations against the City, the Mayor, and one of her appointees. In his constitutional claims, he alleges that Defendants withheld his benefits and interfered with the operation of his department because he supported the Mayor's opponents, spoke out against the Mayor, and because of his religion. Since Falco has not plausibly alleged any constitutional violation, and the Court declines to exercise supplemental jurisdiction over the remaining state law claims, the motion is **GRANTED**.

I. **BACKGROUND**

The allegations that form the background of this case were discussed in depth in the Court's prior opinion, so only those facts relevant to the TAC will be addressed here. See Falco v. Zimmer, No. 13-1648, 2015 WL 7069653 (D.N.J. Nov. 12, 2015) (dismissing second amended complaint).

Plaintiff Anthony Falco became Hoboken's Chief of Police in June 2009. TAC ¶ 14. Falco supported then-Mayor Peter Cammarano, who won an election against Defendant Dawn Zimmer in July. Id. ¶¶ 18, 21. Later that month, however, Cammarano was arrested on federal corruption

1

charges in so-called Operation Big Rig, and Zimmer was appointed Acting Mayor. Id. ¶¶ 23-24. Falco alleges, on information and belief, that Zimmer disapproved of Falco's promotion to Chief because he supported Cammarano, her political rival. Id. ¶¶ 27-28.

After being promoted, Falco claims he did not receive a written contract that at least two prior Chiefs of Police received. Id. ¶¶ 94, 97. The Hoboken Chief of Police receives different compensation and benefits from those received by other superior officers. Superior Officers' employment terms and pay are established by collective bargaining agreements ("CBAs") between the City and the police union. Id. ¶ 89. Pursuant to the CBAs, officers receive certain compensation, including vacation days, personal days, "F-19" days, sick time, and a uniform allowance. Id. ¶ 90. But the Chief of Police is not a party to the CBA, so the City entered into simple contracts with the Chiefs that incorporated many of the compensation points from the inferior officers' CBAs, set forth the terms of employment, and set the compensation due when their time as Chief ended. See id. ¶¶ 94-97. The City never entered into such a contract with Falco when he became Chief but, "consistent with City ordinance and the City's past practice," Falco continued to receive compensation items received by all other superior officers. Id. ¶ 101. Specifically, the City gave him an annual uniform stipend (for the purchase and maintenance of professional clothing) of $1,300.00, an annual attendance incentive (known as a "sick incentive") of $1,500.00, and an annual $500.00 court time and preparation payment. Id. ¶¶ 94, 101.

Falco also alleges that, in Fall 2009, Zimmer began to interfere in the operations of the police department in several ways. He alleges that she "micromanage[d]" the department and attempted to "marginalize" him. Id. ¶ 58. He also alleges that Angel Alicea, the Director of Public Safety ("DPS") and a Zimmer appointee, wrote a memorandum to Falco discussing an on-going confidential Internal Affairs investigation and criticizing Falco for failing to notify DPS of the

investigation. Id. ¶ 65. On another occasion, Falco alleges that someone (he does not say who) distributed a confidential investigation report to civilian City employees without names and sensitive information redacted. Id. ¶ 67. He also alleges that the City's Office of Corporation Counsel ("OCC") "intimidated" an acting Chief into disclosing confidential information while Falco was on vacation. Id. He also points to one undated instance where the Hoboken Parking Director requested a department-wide investigation of the police department. Id. ¶ 78. Falco alleges that the Parking Director requested the investigation in retaliation for a prior incident where he was arrested for unlawfully driving a City bus, though Falco does not allege that any investigation actually occurred. See id. ¶ 83. At some point (again, he does not say when), Falco complained to the Hudson County Prosecutor. Id. ¶ 70.

Another task for the Chief of Police involved selecting the Hoboken Police Department chaplain. At some point in 2010, Falco selected Father Alexander Santora, the pastor for Our Lady of Grace Catholic Church—the Church that Falco belonged to. Id. ¶¶ 32, 33, 35. Father Santora had criticized Zimmer in Church bulletins and in the local media. Id. ¶ 34.

In June 2010, the Prosecutor's Office responded to Falco's complaint about department interference. The Prosecutor drafted a letter opinion indicating that City officials should not have made certain requests for information and that several officials were attempting to exercise authority that rested with the Chief of Police. Id. at ¶ 71.

The following month, in July 2010, Zimmer and Falco met to discuss her plan to reduce the size of the police department through layoffs and demotions. Id. ¶¶ 41, 43. Falco proposed a budget that would not involve layoffs. Id. ¶ 42. Zimmer responded that "there seems to be a disconnect here," and said they were "not on the same page." Id. ¶ 43. Later that month, Zimmer

3

posted a plan for department layoffs. Id. ¶ 45. The police union made several public statements criticizing Zimmer and her plan. Id. ¶ 48. Falco alleges that he "sided" with the union." Id. ¶ 50.

Roughly two years later, in 2012, Zimmer canceled Hoboken's annual St. Patrick's Day Parade. Id. ¶ 38. The parade was a City event, but Our Lady of Grace Church and Father Santora served as event custodians. Id. ¶ 37. Falco criticized the decision, and alleges that Zimmer canceled the event to retaliate against him. Id. ¶¶ 39-40.

At some point that same year, the City stopped paying Falco's uniform stipend and sick incentive, but continued to pay for his annual court time. Id. ¶ 102.

The next year, in March 2013, Falco filed the instant action against Zimmer and the City. Id. ¶ 120; see Compl., Dkt. No. 1. In December 2013, Falco testified in a state court law suit brought by former DPS Angel Alicea against Zimmer and the City. TAC ¶ 123. During his testimony, Falco discussed the Complaint he filed in this action and Zimmer's alleged departmental interference and hostility towards "Old Hoboken." Id. ¶ 124.

In January 2014, Defendant Jon Tooke, Alicea's replacement as DPS, informed Falco that his request for standby court time was denied. Id. ¶¶ 75, 126.

On July 1, 2014, Falco retired from the Hoboken Police Department because he reached the mandatory retirement age of 65. Id. ¶¶ 137-139. Upon retirement, Falco expected to receive so-called "Payment Upon Retirement," consisting of accrued compensable time earned during his employment with the police department. Id. ¶¶ 142, 146. The City did not pay him immediately after he retired. Id. ¶ 144. The City subsequently offered him retirement compensation, but Falco asserts that he is entitled to more money than they offered. Id. ¶¶ 148-49.

## II. PROCEDURAL HISTORY

Falco filed this action on March 18, 2013. Dkt. No. 1. He filed the Second Amended Complaint on February 5, 2015 asserting 42 causes of action. Dkt. No. 58. The Court granted Defendants' motion to dismiss, partially with prejudice. See Order dated November 12, 2015, Dkt. No. 82. The Court permitted Falco to re-file certain claims, including those raising First Amendment retaliation and equal protection violations. Id. On January 26, 2016, Falco filed the TAC (the operative Complaint) and Defendants moved to dismiss under Rule 12(b)(6). Dkt. Nos. 93, 103.

## III. LEGAL STANDARD

When considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all of the facts in the complaint and draws all reasonable inferences in favor of the plaintiff. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). Dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." Id. The facts alleged, however, must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id. Accordingly, a complaint will survive a motion to dismiss if it provides a sufficient factual basis such that it states a facially plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## IV. ANALYSIS

The TAC asserts nineteen causes of action. Counts One, Two, and Three assert federal

constitutional claims under 42 U.S.C. § 1983.  The remaining Counts assert claims under New Jersey state law.[1]

### A. First Amendment Retaliation Claims (Counts One and Two)

In Counts One and Two, Falco asserts First Amendment retaliation claims.  To plead a First Amendment retaliation claim, a plaintiff must allege "(1) that [the plaintiff] engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action."  Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007); see also Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006).  In Count One, the retaliation relates to Falco's speech; in Count Two, it relates to his religion.  The Court will address each in turn.

### 1. *Retaliation Based on Speech (Count One)*

In Count One, Falco alleges that Defendants retaliated against him by interfering in his department beginning in 2009, and by refusing to pay him certain compensation in 2012 (totaling $2,800) and 2013 (totaling $500).  He alleges that Defendants did this because he engaged in protected speech on three occasions: (1) he expressed support for Zimmer's opponents in 2009,

---

[1] Defendants argue as a threshold matter that Falco should be estopped from re-litigating his First Amendment claims because the Court dismissed his prior First Amendment claims with prejudice.  The Court disagrees because the factual predicates that give rise to the TAC's claims are different.  For example, in the SAC, Falco alleged two protected activities: his litigation activity in 2013 and his association with "Old Hoboken."  Here, Falco asserts protected activity related to his support for Zimmer's political opponents in 2009, his criticism of her layoff plan in 2010, and his membership in the local Church.  The Court's prior dismissal order does not preclude Falco from raising these new claims here.  However, while Falco does re-raise similar issues regarding his 2013 litigation activity, the Court dismisses those claims for the same reasons set forth in its previous decision, as discussed below.

(2) he opposed Zimmer's layoff plan and supported the police unions in 2010, and (3) he filed this suit and testified in the Alicea matter in mid- and late-2013.

Defendants argue that Falco's allegations are either not causally related or would not deter a person of ordinary firmness from exercising his or her rights. The Court agrees.

### a. Support for Political Opponents in 2009

The Court turns first to Falco's speech in 2009. He alleges that he spoke out in favor of Zimmer's political opponents, including former Mayer Cammarano, at some point in 2009.

First, Falco's allegation that Defendants interfered with his department fails to state a claim because it would not deter a person of ordinary firmness from speaking out. He alleges that DPS Alicea published an investigation report, but he does not allege that the report was related to him in any way. He also makes the conclusory allegation that a member of the OCC tried to "intimidate" another acting chief, but he does not connect this vague allegation to himself. He also asserts that other City employees called for investigations into his department, but he does not allege that anyone actually initiated any investigation. These types of allegations would not reasonably prevent a person from speaking out. Moreover, the interference plainly did not deter Falco from speaking out. After these events occurred, he continued to speak out against Zimmer and the City, even intensifying his opposition by formally complaining to the Hudson County Prosecutor. He therefore cannot establish a retaliation claim based on interference with his department.

Second, Falco's claim that he lost benefits because he supported Zimmer's opponents fails for lack of causation. To satisfy the causal inquiry under the third prong of the test, a plaintiff must prove that his protected activity was "a substantial or motivating factor" in the retaliatory action. See Hill v. Borough of Kutztown, 455 F.3d 225, 243 (3d Cir. 2006). To establish the

7

requisite causal connection, the plaintiff usually must prove one of two things: (1) "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action" or (2) "a pattern of antagonism coupled with timing to establish a causal link." Lauren W., 480 F.3d at 267. If neither showing is made, then the plaintiff must show that, from the evidence in the record as a whole, the trier of fact should infer causation. Id.

Here, Falco has not plausibly alleged any of these connections. He has not alleged "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action." Id. He alleges that the speech at issue occurred sometime in 2009, but that the loss of benefits occurred, at the earliest, in 2012. This three year lapse in time cuts against a causal link between the events.

Falco argues that the years separating his speech and the adverse act does not undermine his claim. In support, he cites to Mandell v. Cty. of Suffolk, 316 F.3d 368 (2d Cir. 2003). In Mandell, the court held that a reasonable juror could find a causal link between a police officer's public statements that were critical of his department and the department's decision not to promote him several years later. Id. at 383. The Court held so because the plaintiff provided direct evidence from the intervening years of retaliatory animus, including a letter removing him from the local PBA because he branded the department "as racists and anti-semites," a warning by the Chief of Police to "keep his mouth shut," and the Chief's admission that the plaintiff's criticism has lasting "baggage." Id. at 383-84.

Here, however, Falco has not shown any similar pattern of antagonism in the time between. He asserts in his brief that the harms "intensified" but does not say how. See Opp'n Br. at 10-11. He also concedes that Defendants provided him with these benefits from 2009 through 2011, even though they had the opportunity to take them away during that time. Moreover, the series of

vignettes that make up his allegations are largely undated, see, e.g., TAC ¶¶ 29, 30, 68, 70, 77-78; do not involve either him personally or the named Defendants, see, e.g., id. ¶¶ 38, 49, 67, 78-79; or involve the type of nonactionable workplace slights and office politics that do not lend inferential support to his retaliation claim, see, e.g., id. ¶¶ 65, 78, 83-85.

Falco does not otherwise direct the Court to any allegations that would permit it to infer causation from the record as a whole. At its core, his causation argument is that the loss of benefits occurred after his speech in 2009, so it must have occurred because of that speech. But where, as here, the speech and adverse act are separated by several years, Falco must provide factual enhancement to sustain that claim. See Revell v. City of Jersey City, 394 F. App'x 903, 907 (3d Cir. 2010) (no causal connection where adverse event occurred a year after plaintiff was told to stop writing complaints); Killion v. Coffey, No. 13-1808, 2015 WL 7345749, at *11 (D.N.J. Nov. 19, 2015) (granting motion to dismiss where speech and first retaliatory act separated by four years). He does not do so. As such, he does state a retaliation claim based on his support for Zimmer's political opponents in 2009.

b.  Layoff Plan & Support for Unions in 2010

Next, Falco generally asserts that he engaged in protected speech when Zimmer proposed a layoff plan for the police force in 2010, but he only points to a single statement: the July 2010 budget proposal he offered to Zimmer, to which she responded that they were "not on the same page." TAC ¶ 43. Falco also asserts that he engaged in speech supporting the police union, but the TAC only alleges that he "sided" with the union. See TAC ¶¶ 48, 50. There is no mention of comments he made in support of the police union. As such, the only protected speech relating to the layoffs is his single statement at the July 2010 meeting.

9

The same causation issues impact this statement as those from 2009. The July 2010 comment occurred at least two years before he lost his first benefit 2012, and Falco does not provide any allegations in the interim that could reasonably connect the events. He argues that a causal link is plausible because Zimmer said they were "not on the same page" and that there was a "disconnect" between their budget plans. See TAC ¶ 43. These statements indicate that Zimmer disagreed with Falco's plan, but they cannot reasonably be construed as evidence of retaliatory animus. Drawing on experience and common sense, the Court is not persuaded that such run-of-the-mill statements of disagreement made in the workplace provide support for his claim.

        c.   Litigation Activities in 2013

The final speech-related act fails, as well. Falco alleges that Defendants interfered with his department and withheld his benefits because he filed this suit in March 2013 and testified in the Alicea matter in mid- and late-2013.

This theory fails for the same reasons as stated in the Court's prior opinion. See Op. at 15-16. Specifically, the interference in operations and denial of most of the benefits predate the litigation activities in mid- to late-2013; the $500 court standby payment was de minimis given the circumstances; and Falco has not demonstrated a legitimate expectation of retirement payments. Id.

Falco does assert new arguments to support his right to Payment Upon Retirement, but the allegations do not overcome the deficiencies in the SAC. The Court dismissed the theory last time because Falco did "not allege that he was entitled to the payment. He merely asserts a unilateral expectation that he would receive it because other HPD officers did when they retired. Nor does he allege that Defendants ever promised or suggested that Plaintiff would receive the payment. Without alleging any legitimate right or reasonable expectation to payment, [Falco] cannot

plausibly allege that Defendants withheld the payment in retaliation." Op. at 16. Falco has not asserted any new allegations that change this result. For example, he now alleges entitlement because the City' had a practice of paying his predecessors, but the Court rejected this same argument previously. See id. Second, he argues that the City gave him some benefits that inferior officers received—e.g., sick time and uniform allowance—so he is entitled to retirement payments. But the fact that the City gave him certain stipends during his tenure as Chief does not entitle him to every kind of benefit that the superior officers received, particularly where those officers expressly bargained for retirement benefits in their CBAs. Third, he alleges that "a City ordinance" requires him to receive the same compensation as the bargaining units he supervised, but he does not name the ordinance in the TAC, and none of the litany of statutes or ordinances he cites support such a proposition.[2] See TAC ¶ 146; Opp'n Br. at 25. Finally, as Falco asserts, the City believes he should receive some amount of Payment Upon Retirement, and he admits that the City has offered him payment. See TAC ¶¶ 147, 149. He alleges that he is contractually entitled to more money, id. ¶ 150-51, but that fact hurts—not helps—his claim. He cannot claim retaliation based on the City's refusal to pay compensation when it has in fact attempted to make such a payment. As he seems to acknowledge in the TAC, his grievance sounds in contract law. It is not a constitutional claim. See id. ¶ 151 ("Defendants' [offer of Payment Upon Retirement] breached a contract between Plaintiff and the City . . . .").

Accordingly, Falco has failed to state a claim in Count One for retaliation based on protected speech.

---

[2] Falco submits a copy of one ordinance, Ordinance No. Z-20, but the document only provides that Department Heads are entitled to equivalent benefits as those offered to the Hoboken Municipal Supervisor's Association. See Orlando Cert. Ex. A. at 1-2, Dkt. No. 115-1. It does not mention the police unions discussed in the TAC. Moreover, it is dated March 2015, after Falco already retired.

### *2. Retaliation Based on Religion (Count Two)*

In Count Two, Falco asserts a retaliation claim based on religion. See TAC ¶¶ 160-64. As in Count One, he alleges that Defendants intentionally retaliated against him by refusing to pay his compensation and interfering with his department. In Count Two, however, he alleges that they did so because he engaged in two protected acts related to his religion—his membership in Our Lady of Grace Catholic Church and his association with the Church's pastor, Father Santora.

Defendants argue that Falco has not alleged a causal link between his religion and the alleged retaliatory acts. The Court agrees.

Nothing in the TAC creates a plausible nexus between his membership in the Church and the alleged retaliation. Aside from the legal conclusion that the retaliation occurred "[b]ecause of Plaintiff's membership in OLG," TAC ¶ 40, Falco merely alleges that he is a regular member of the Church and that his benefits were eventually removed. Such "naked assertions devoid of further factual enhancement" will not survive a motion to dismiss. See Iqbal, 556 U.S. at 678 (internal quotations and brackets omitted).

In response, Falco points to his allegation that Zimmer canceled the Hoboken St. Patrick's Day Parade in 2012. TAC ¶ 38. But the fact that a single City-run event, which is tangentially related to his church, was canceled several years after Zimmer and Falco began working together does not salvage his claim. Nor does he connect the cancellation to his church membership or faith, specifically. Instead, he alleges that the event was "popular among OLG parishioners and other Catholics residing in and near Hoboken." The Court cannot reasonably infer that Falco's religion was "a substantial or motivating factor" in the cancellation based on such scant allegations.

Falco's claim that he was retaliated against for associating with Father Santora also fails. Falco asserts that he was retaliated against because of his "religious affiliation with a particular . .

. pastor in Hoboken." Opp'n Br. at 9.  Falco has not alleged any facts that suggest Defendants took action against him because of his religious affiliation with Father Santora.[3]

Accordingly, Count Two is dismissed.

### B. Equal Protection Claim (Count Three)

In Count Three, Falco asserts a claim under the Equal Protection Clause of the Fourteenth Amendment.  See TAC ¶¶ 165-69.  In the same vein as his First Amendment claim, Falco asserts that Defendants intentionally discriminated against him because of his membership at the Church and his association with Father Santora.

To state an Equal Protection claim, a plaintiff must allege that (1) he is a member of a protected class; (2) that he was treated differently from similarly situated individuals; and (3) that this disparate treatment was based on his membership in the protected class.  See Kasper v. Cnty. of Bucks, 514 F. App'x 210, 214 (3d Cir. 2013) (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir.1990)).

Here, assuming Falco has alleged membership in a protected class based on religious affiliation, he still has not plausibly pled the second or third elements.  First, Falco compares his treatment to other lower-ranking officers, but does not allege how these officers (who received different benefits and were expressly covered by CBAs) are similarly situated to him.  Second, Falco compares his treatment to former and subsequent chiefs of police.  But Falco does not allege that any of them had different religious affiliations.  Absent that, the Court cannot draw a plausible

---

[3] The Court does not construe this theory as one for the exercise of free speech.  Falco has asserted the claim as retaliation for protected activity related to religion, not political expression.  See TAC ¶¶ 160-62.  In any event, Falco cannot maintain such a theory because he has not alleged that he engaged in any speech.  He only alleges that Father Santora did, and that he was punished for appointing Father Santora.  Thus, the claim that Falco faced retaliation because of his relationship with Father Santora fails regardless of whether it is construed as a protected act related to religion or speech.

13

inference that Defendants' differential treatment of Falco was related to religious affiliation. Count Three is also dismissed.

### C.  State Law Claims (Counts Four to Nineteen)

The remaining claims all arise under state law.  Where, as here, the district court has dismissed all claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction.  28 U.S.C. § 1367(c)(3).  Since this case is still in the pleading stage, and in light of the goal of avoiding needless decisions of state law, the Court declines jurisdiction over the remaining claims.  See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).  Counts Four to Nineteen are accordingly dismissed pursuant to § 1367(c)(1).

### V.  CONCLUSION

For the reasons set forth herein, Defendants' motion to dismiss, Dkt. No. 103, is **GRANTED**.  An appropriate Order accompanies this Opinion.

**Dated: December 7, 2016**

*/s Madeline Cox Arleo*
**Hon. Madeline Cox Arleo**
**UNITED STATES DISTRICT JUDGE**