<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **ANTHONY P. FALCO, SR.,** | |
| *Plaintiff,* | **Civil Action No. 13-1648** |
| **v.** | **OPINION** |
| **DAWN ZIMMER, et al.,** | |
| *Defendants.* | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of Defendants City of Hoboken's ("Hoboken") and Jon Tooke's ("Tooke" and together with Hoboken, the "Hoboken Defendants") Motion for Summary Judgment, ECF No. 178, and Defendant Dawn Zimmer's ("Zimmer," and together with the Hoboken Defendants, "Defendants") Motion for Summary Judgment, ECF No. 179. Plaintiff Anthony P. Falco, Sr. ("Plaintiff") opposes the Motions. ECF No. 185. For the reasons explained below, the Motions are **GRANTED** in part and **DENIED** in part.

## I.    FACTUAL BACKGROUND[1]

This First Amendment action arises out of a longstanding dispute between Anthony Falco, the former Chief of Police of the Hoboken Police Department ("HPD"), and Dawn Zimmer,

---

[1] The background of this action has been discussed at length in prior opinions of this Court and the Third Circuit. <u>See</u> <u>Falco v. Zimmer</u>, No. 13-1648, 2015 WL 7069653 (D.N.J. Nov. 12, 2015) ("<u>Falco I</u>"); <u>Falco v. Zimmer</u>, No. 13-1648, 2016 WL 7175594 (D.N.J. Dec. 7, 2016) ("<u>Falco II</u>"); <u>Falco v. Zimmer</u>, No. 13-1648, 2017 WL 4776605 (D.N.J. Oct. 20, 2017) ("<u>Falco III</u>"); <u>Falco v. Zimmer</u>, 767 F. App'x 288 (3d Cir. 2019) ("<u>Falco IV</u>").

These facts are drawn from factual allegations in the Fourth Amended Complaint ("FAC"), ECF No. 131 (where undisputed), the Hoboken Defendants' Statement of Material Facts ("Hb. SOMF"), ECF No. 178.2, Plaintiff's Responsive Statement of Material Facts ("Pl. RSOMF"), ECF No. 185.1, Plaintiff's Supplemental Statement of Material Facts ("Pl. SSOMF"), ECF No. 185.2, and the evidence submitted by the parties. Disputes of fact are noted.

Hoboken's former mayor.  Plaintiff's Second Amended Complaint pled forty-two counts, asserting a wide range of claims under both federal and state law.  This Court dismissed that Complaint without prejudice and twice allowed plaintiff to replead his claims, before dismissing the Fourth Amended Complaint with prejudice.  On appeal, the Third Circuit affirmed the dismissal of certain claims and permitted a narrowly defined First Amendment retaliation claim to proceed. Defendants now move for summary judgment, seeking dismissal of the sole remaining First Amendment claim.

Although Plaintiff's Fourth Amended Complaint recites the long history between Plaintiff and various Hoboken officials, this opinion will highlight only those facts relevant to the remaining First Amendment claim.

### A.    Plaintiff's Promotion to Chief and Compensation

Following decades of service in the HPD, Plaintiff was appointed as Chief of Police on June 18, 2009 by Susan Jacobucci, the Director of Local Government Services for the State of New Jersey ("Jacobucci").[2]  Hb. SOMF ¶¶ 6, 18.  Jacobucci appointed Plaintiff "at a base salary not to exceed $153,000 base pay," but unlike others who served as Chief, Plaintiff did not receive a separate employment contract governing his compensation and benefits.  Hb. SOMF ¶¶ 19-20; Falco Dep. Tr. 308:22-25, Certification of Christopher D. Zingaro ("Zingaro Cert.") Ex. D., ECF No. 185.7.  When Plaintiff requested a formal contract in 2012, Hoboken's counsel informed that him that Hoboken was under no obligation to provide a contract, and that there would be no negotiation regarding any proposed contract.  FAC ¶ 158.

Prior to his promotion to Chief, Plaintiff received compensation pursuant to a collective bargaining agreement between the Police Senior Officers Association ("PSOA") and Hoboken.

---

[2] The State controlled Hoboken's day-to-day fiscal management from 2008 to 2010.  Hb. SOMF ¶¶ 7, 9.

FAC ¶ 140; see also Zingaro Cert. Ex. XX (the "PSOA Agreement"), ECF No. 185.54.  While Plaintiff ceased to be a member of the PSOA after his promotion, Hb. SOMF ¶ 24, from 2009 to 2011 he received certain benefits that other HPD superior officers received under the PSOA Agreement, including longevity pay of 18% his base salary, an annual uniform stipend of $1,300, an annual attendance or "sick" incentive stipend of $1,500, and an annual court time and preparation stipend of $500.  FAC ¶ 131; Hb. SOMF ¶ 19; Pl. RSOMF ¶ 19; Pl. SSOMF ¶ 41.  Plaintiff also received the court stipend in 2012 and 2013.  Falco Dep. Tr. 384:16-19.

### B. Falco's Speech Activities

Plaintiff asserts that Defendants retaliated against him for three separate speech activities.

First, during his tenure with the HPD, Plaintiff supported several candidates for public office who opposed Zimmer or her administration.  Just prior to his promotion to Chief in 2009, Plaintiff attended a fundraiser and rally and distributed campaign literature within his apartment building for mayoral candidate Peter Cammarano in his campaign against Zimmer.  Falco Dep. Tr. 173:18-174:22, 194:19-195:2.  Plaintiff also belonged to the PSOA, which endorsed Cammarano.  Pl. SSOMF ¶¶ 9-10.  However, Plaintiff never issued any public statements or letters of endorsement and his support for Cammarano was never reported in the press.  Falco Dep. Tr. 174:16-175-19.[3]

In addition, during Zimmer's first term,[4] Plaintiff supported candidate Tim Occhipinti ("Occhipinti") in 2010 and 2011 elections for city council in Hoboken's fourth ward against Zimmer's preferred candidate, Michael Lenz.  FAC ¶ 39; Falco Dep. Tr. 236:3-237:6.  Plaintiff

---

[3] Vincent Lombardi, an HPD officer and former president of the Police Benevolent Association, also testified that Plaintiff did not publicly endorse Cammarano in his capacity as Captain.  Lombardi Dep. Tr. 58:22-25, Zingaro Cert. Ex. F, ECF No. 185.9.

[4] Zimmer became Acting Mayor on July 30, 2009, following Cammarano's arrest on corruption charges and resignation.  Hb. SOMF ¶¶ 11-13.  She was elected to complete the remainder of Cammarano's term on November 6, 2009 and elected to a second full term in November 2013.  Id. ¶¶ 14-15.

spoke to residents of the fourth ward and attended a rally, but he did not appear in any campaign literature or use electronic communication such as social media to voice his support.  Falco Dep. Tr. 236:7-15, 237:7-16.

Plaintiff also supported Ruben Ramos ("Ramos"), Zimmer's opponent in her 2013 campaign for reelection, by speaking with people in his apartment building, distributing literature in his building, and informing certain unnamed people of his support for Ramos.  Falco Dep. Tr. 239:12-25.

Second, on December 11, 2013, Plaintiff testified in a discrimination and retaliation lawsuit brought by former Director of Public Safety ("DPS") Angel Alicea ("Alicea") against Zimmer and Hoboken.  Hb. SOMF ¶ 39; see also Zingaro Cert. Ex. GG ("Alicea Trial Tr."), ECF No. 185.36. Among other things, Plaintiff testified about drug testing and illegal steroid use in the HPD, his objections to layoffs and demotions proposed by Zimmer, and his view that Zimmer targeted him due to his perceived affiliation with the "old guard" of Hoboken and his perceived support of Cammarano and a candidate for councilperson in the fourth ward.  Hb. SOMF ¶¶ 41-42; Pl. RSOMF ¶¶ 41-42; see e.g., Alicea Trial Tr. 128:16-129:10.

Third, while still employed by the HPD, Plaintiff filed this lawsuit.

### C.   Defendants' Alleged Adverse Employment Actions

Defendant Tooke replaced Alicea as DPS in late 2011.  Pl. RSOMF ¶ 32; Tooke Dep. Tr. 64:14-17, Zingaro Cert Ex. BB, ECF No. 185.31.  Shortly thereafter, Hoboken took several actions that reduced or delayed Plaintiff's compensation as Chief.

First, in January 2012, Tooke denied Plaintiff's requests for an annual uniform stipend and annual attendance incentive (the "Uniform and Attendance Benefits").  Hb. SOMF ¶ 35; Pl. RSOMF ¶ 35; Zingaro Cert. Ex. W, ECF No. 185.26.  Tooke testified that he personally made the

decision to withhold these benefits, after consultation with Hoboken's corporation counsel and business administrator, based on his belief that Plaintiff was no longer a member of the PSOA and thus not entitled to incidental benefits under the PSOA Agreement. Tooke Dep. Tr. 80:4-22, 208:16-209:8. Plaintiff also did not receive either of these benefits in 2013 or 2014. Falco Dep. Tr. 383:16-384:9.[5]

Second, Hoboken increased Plaintiff's salary by 1.95% with an effective date of January 1, 2013 but did not process the raise until May 2013. See Zingaro Cert. Ex. HH, ECF No. 185.37; Falco Dep. Tr. 62:18-63:19. Plaintiff acknowledges that he received payment representing a January 1, 2013 salary increase retroactively. Pl. Opp. 14.

Third, in September 2013, Hoboken declined to issue Plaintiff a "Superstorm Sandy" payment that was made available to other HPD officers (the "Sandy Benefit").[6] FAC ¶ 189.

Fourth, on January 7, 2014, Tooke denied Plaintiff's request for a "court time" incentive (the "Court Benefit"). See Zingaro Cert. Ex. JJ, ECF No. 185.39. As with the uniform stipend and attendance incentive, Tooke testified that he decided to withhold the court payment after speaking with the business administrator and corporation counsel because Plaintiff no longer belonged to the PSOA. Tooke Dep. Tr. 107:12-20.[7]

Finally, Plaintiff retired from the HPD on July 1, 2014, but did not immediately receive the "payment upon retirement" typically distributed to HPD officers within thirty to sixty days of retirement (the "Retirement Benefits"). FAC ¶¶ 213, 216; Tooke Dep. Tr. 228:18-229:3. On

---

[5] Plaintiff did ultimately receive a $3,900 payment representing a uniform allowance from 2012, 2013, and 2014 in connection with his retirement payout. See Zingaro Cert. Ex. ZZ.

[6] The exact nature of this payment is unclear and not addressed in any detail by either party. The FAC describes it as a "stipend" equal to five days' pay that Hoboken distributed to HPD officers who served during Superstorm Sandy in 2012. FAC ¶¶ 189-92. The Hoboken Defendants contend it was a "form of overtime." Hoboken Ans. ¶ 189, ECF No. 174. And Plaintiff testified that officers did not receive a payment at all, but rather were credited with five additional vacation days. Falco Dep. Tr. 461:16-22, 552:5-13.

[7] Defendants maintain that Plaintiff did, in fact, receive the Court Benefit in 2014. Hb. SOMF ¶ 52.

September 10, 2014, Hoboken issued Plaintiff a $104,414.81 check representing net payment, less federal and state taxes, for 195 "terminal days" Plaintiff accrued over the course of his HPD career and 78 vacation days he accrued in 2013 and 2014.[8] See Certification of David J. Pack ("Pack Cert.") Ex. T, ECF No. 178.7. Plaintiff contends that when Defendants issued Plaintiff's retirement payment, they withheld certain amounts owed to him in accrued compensable time. See FAC ¶¶ 165, 215, 220.

## II.   PROCEDURAL HISTORY

Plaintiff filed his initial Complaint against Zimmer and Hoboken on March 18, 2013. ECF No. 1. Plaintiff added Tooke as a defendant on January 26, 2016 in the Third Amended Complaint. ECF No. 93. On January 20, 2017, Plaintiff filed the single-count FAC alleging that Defendants retaliated against Plaintiff for exercising his freedom of speech, in violation of the First Amendment and 42 U.S.C. § 1983 ("Section 1983"). See generally FAC.

On October 20, 2017, the Court dismissed the FAC with prejudice for failure to state claim upon which relief could be granted. See generally Falco III, 2017 WL 4776605. The Third Circuit reversed in part on narrow grounds, holding that Plaintiff had plausibly alleged three types of protected speech and one type of unlawful retaliation. Falco IV, 767 F. App'x at 300-15. Specifically, the Third Circuit held that Plaintiff engaged in protected speech by (1) supporting Zimmer's political opponents in municipal elections; (2) testifying during the Alicea trial; and (3) filing the instant lawsuit. Id. at 304-10. The court further held that Plaintiff could pursue his retaliation claim based on the alleged denial or delay of certain benefits described above, i.e., (a) an

---

[8] Plaintiff initially declined to accept this check, arguing that it was "too little" and "too late." See ECF No. 43. When Plaintiff failed to deposit the initial check, Hoboken issued a replacement on November 18, 2015, which Plaintiff deposited. Pack Cert. Ex. U; Zingaro Cert. Ex. CCC. On December 30, 2015, Hoboken issued a second check in the amount of $14,780.37 representing net payment of certain additional benefits that Hoboken provided to other retired Chiefs and a uniform allowance for the years 2012, 2013, and 2014. Pack Cert. Ex. V.

annual uniform stipend and attendance incentive in 2012, 2013, and 2014; (b) a 1.95% salary increase paid to other HPD officers in January 2013; (c) a payment for working shifts during Superstorm Sandy; (d) an annual court time and preparation payment in 2014; and (e) an "unspecified portion" of Plaintiff's retirement compensation. Id. at 311-14.[9]  All other claims were dismissed.

Defendants now move for summary judgment on Plaintiff's retaliation claim.  ECF Nos. 178 & 179.

### III.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the Court will grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with available affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).

The Court construes all facts and inferences in the light most favorable to the non-moving party.  Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).  "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue

---

[9] Plaintiff also asked the Third Circuit to revive claims he had raised in previous complaints based on procedural due process, retaliation for Plaintiff's exercise of his First Amendment freedom of association, and conspiracy to violate civil rights under 42 U.S.C. § 1985 ("Section 1985").  See Falco IV, 767 F. App'x at 296.  The Third Circuit affirmed this Court's dismissal with prejudice of the due process claims and held that Plaintiff had waived his freedom of association and Section 1985 claims.  Id. at 300, 315-17 & n.3.

for trial." Anderson, 477 U.S. at 248 (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)) (internal quotation marks omitted).

**IV.   ANALYSIS**

A public employee's First Amendment retaliation action is governed by a burden-shifting framework. To establish a prima facie case, the employee must provide evidence of retaliatory intent by establishing two elements.

First, the employee must demonstrate that "his [activity] is protected by the First Amendment." Falco IV, 767 F. App'x at 299 (quoting Munroe v. Cent. Bucks Sch. Dist., 805 F.3d 454, 466 (3d Cir. 2015)). Speech is protected where "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006) (quoting Garcetti v. Ceballos, 547 U.S. 410 (2006)). The question of whether a public employee engaged in protected speech is a matter of law. Falco IV, 767 F. App'x at 299 (citing Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009)).

Second, the employee must show that his protected speech "was a substantial or motivating factor in the alleged retaliatory action." Id. (quoting Munroe, 805 F.3d at 466). Here, the employee must prove that (1) the employer had actual knowledge of his protected speech; (2) the employer took an adverse employment action that was "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights;" and (3) a causal link exists between the protected speech and the adverse action. Id. at 310-11. This second element is typically "a question of fact for the jury." Id. at 310 (citing McGreevy v. Stroup, 413 F.3d 359, 364 (3d Cir. 2005)).

If the employee satisfies both elements, the burden shifts to the employer to prove that the alleged retaliatory action "would have been taken even if the [activity] had not occurred." Id. at 299 (citing Munroe, 805 F.3d at 466).

### A.   Protected Speech

Although this issue was addressed by the Third Circuit, Defendants nonetheless argue that Plaintiff's trial testimony was not protected speech because Plaintiff testified in his capacity as Chief, and because his testimony primarily concerned "personal employment grievances."  The Court disagrees.

The Third Circuit has already held that the first two components of the protected speech inquiry—whether the employee spoke as a citizen and on a matter of public concern—are satisfied as to the Alicea testimony as a matter of law.  First, "a public employee speaks as a citizen when testifying truthfully in court proceedings, even if the court testimony stems from his official duties."  Falco IV, 767 F. App'x at 308 (citing Reilly v. City of Atl. City, 532 F.3d 216, 231 (3d Cir. 2008)).  Accordingly, any "factual dispute over whether Falco's testimony in Alicea was within his ordinary job duties as Chief of the HPD is of no moment."  Id.  Second, "[a]ll court appearances are matters of public concern."  Id. at 307 (quoting Green v. Phila. Hous. Auth., 105 F.3d 882, 888 (3d Cir. 1997)).  Therefore, the content of Plaintiff's testimony is wholly irrelevant to determining whether it was a matter of public concern.  Regardless, a review of the transcript shows that Plaintiff testified on issues of public concern, including alleged retaliation by Zimmer against himself and others and illegal steroid use within the HPD.  See Alicea Trial Tr; Falco IV, 767 F. App'x at 309 ("[S]peech disclosing public officials' misfeasance is protected.") (citation and quotation marks omitted).

As to the final component—whether the employer had an adequate justification—a public employee's voluntary court testimony may lose protection where it is outweighed by a government employer's justifiable reasons for treating the employee differently, such as the "risk of departmental injury based on the potential disruptiveness of the speech." Green, 105 F.3d at 888 (citation and quotation marks omitted). Defendants here, however, "do not assert . . . any government interest that tips the balance in their favor." Lane v. Franks, 573 U.S. 228, 242 (2014).

Plaintiff has therefore established that his testimony in Alicea was protected by the First Amendment.[10]

### B.       Substantial or Motivating Factor for Adverse Action

Defendants next argue that Plaintiff cannot show that his protected speech was a substantial or motivating factor in the decision to withhold or delay compensation. The Court agrees that there is insufficient evidence to support a retaliation claim based on (a) the denial of the Uniform and Attendance Benefits, (b) the delay of Plaintiff's 1.95% salary increase in 2013, or (c) the alleged underpayment of Plaintiff's Retirement Benefits. However, a jury question exists as to whether Defendants retaliated by (a) denying the Sandy Benefit in 2013, (b) denying the Court Benefit in 2014, or (c) delaying Plaintiff's Retirement Benefits.

As set forth above, to survive summary judgment Plaintiff must point to evidence from which a reasonable jury could determine that (1) Defendants had actual knowledge of his speech; (2) Defendants took an adverse employment action that is "more than de minimis" and "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights;" and (3) a causal link exists, although Plaintiff "need not show that the decision was motivated solely by anti-

---

[10] Defendants do not dispute that Plaintiff's support of candidates in municipal elections or the filing of this lawsuit constitute protected speech. See Falco IV, 767 F. App'x at 305, 307-08.

speech animus or even that the illegal animus was the dominant or primary motivation for the retaliation." Falco IV, 767 F. App'x at 310-11 (citations and quotation marks omitted). The Court considers each component in turn.

### 1. Knowledge of Protected Speech

"[I]n order to retaliate against an employee for his speech, an employer must be aware of that speech." Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002) (citation and quotation marks omitted). Moreover, because "temporal proximity" alone may not be used to demonstrate knowledge, Plaintiff must point to specific evidence showing that Defendants were aware of his protected speech at the time of each adverse actions. Id. at 493-94.

### a. Support of Political Opponents in Municipal Elections

Defendants argue that Plaintiff has produced no evidence that would permit a reasonable jury to find that Zimmer or Tooke knew of Plaintiff's support of election candidates opposed to Zimmer during the relevant time period. Critically, Plaintiff may not rely on evidence that merely shows Defendants' awareness of his political associations or other activities that fall outside the scope of this lawsuit. See Falco IV, 767 F. App'x at 312 ("[O]nly retaliation claims relating to Falco's speech, not associations, are viable in this case at this point. We must therefore disregard . . . references to Falco's associations."). After careful review of the voluminous record, the Court agrees with Defendants that Plaintiff has shown no direct or circumstantial evidence that at the time of the alleged adverse actions, Defendants were aware of Plaintiff's support for Cammarano in the 2009 mayoral election, Occhipinti in the 2010 and 2011 city council elections, or Ramos in the 2013 mayoral election.[11]

---

[11] Plaintiff suggests that the Third Circuit previously found evidence of Defendants' knowledge by holding—for purposes of determining whether the FAC stated a plausible claim for relief—that knowledge of Plaintiff's political support could be inferred from allegations that the support was a "public activit[y]." Falco IV, 767 F. App'x at 313. Given the below-discussed evidence reflecting the limited nature of Falco's public support for election candidates and

The evidence demonstrates that Plaintiff's public support of these candidates was relatively limited. Plaintiff testified that he attended a fundraiser for Cammarano and one rally each for Cammarano and Occhipinti. Falco Dep. Tr. 173:18-174:3, 236:7-10. He also spoke with certain unnamed individuals in support of Occhipinti and Ramos, and distributed campaign literature within his own apartment building to support Cammarano and Ramos. Id. at 174:16-175:19, 235:25-236:13, 239:12-25. Plaintiff, however, never issued public endorsements or statements, and his support was never reported in the press. Id. at 174:16-175:19. Plaintiff also did not appear in campaign literature and did not use social media or other electronic communication to show his support. Id. at 237:7-16.

Zimmer testified in 2018 that she was not aware of Plaintiff's support for particular candidates until a recent briefing on the contents of this lawsuit. Zimmer Dep. Tr. at 43:18-22, 58:18-21.[12] Plaintiff proffers five broad categories of evidence in his attempt to refute this testimony.

First, Plaintiff points to evidence concerning his affiliation with a loosely defined faction called "Old Hoboken," his membership in the PSOA at the time that the union endorsed Cammarano for Mayor, and Zimmer's alleged general hostility towards the police unions and members of "Old Hoboken." See, e.g., Pl. SSOMF ¶¶ 9-13, 19-21, 29.[13] As discussed, however,

---

lack of any awareness by Zimmer and Tooke, the Court declines to apply the same presumption at the summary judgment stage. See, e.g., Schlarp v. Dern, 610 F. Supp. 2d 450, 471 & n.13 (W.D. Pa. 2009) (finding the publication of protected speech in the local media insufficient to impute knowledge of the speech to borough's residents "without producing some evidence of their knowledge") (citing Ambrose, 303 F.3d at 493).

[12] Zimmer gave this testimony as to Cammarano and Occhipinti but was not asked about Plaintiff's support for Ramos at her deposition.

[13] The Court disagrees with Plaintiff's contention that the fact Plaintiff, Cammarano, Occhipinti, and Ramos are supposedly affiliated with "Old Hoboken" has evidentiary relevance concerning Zimmer's knowledge of Plaintiff's specific political activities. As Plaintiff acknowledges, the Third Circuit did not disturb this Court's prior holding that Plaintiff's description of "Old Hoboken" is too ill-defined and amorphous to constitute a protected political affiliation. See Falco I, 2015 WL 7069653, at *10. For similar reasons, a reasonable jury could not conclude that Zimmer's

Plaintiff may not rely on his associations to support his free speech claims.  Falco IV, 767 F. App'x at 312.[14]

Second, Plaintiff directs the Court to evidence tending to show Zimmer's knowledge of activities outside the present scope of this lawsuit, including Plaintiff's and other HPD officers' public opposition to Zimmer's proposed budget and layoff plan, see Pl. SSOMF ¶¶ 20-31; Zingaro Cert. Ex. U; Plaintiff's planned attendance at a community meeting to discuss a crime increase in Hoboken with alleged "political overtones," see Pl. SSOMF ¶ 35; Zingaro Cert. Ex. Q; and the arrest of Ian Sacs, allegedly a political ally of Zimmer's, see Pl. SSOMF ¶¶ 59-62.  Zimmer's knowledge of these activities in no way suggests knowledge of Plaintiff's separate speech on behalf of Cammarano, Ramos, or Occhipinti.

Third, Plaintiff argues that documents filed in connection with this lawsuit demonstrate Zimmer's knowledge, with specific reference to a September 20, 2013 letter filed by Defendants' counsel that accuses Plaintiff of "join[ing] a group of political opponents of the Mayor" to engage in "politics by litigation."  See Zingaro Cert. Ex. J.  The Court observes, however, that Plaintiff did not allege his support for election candidates opposed to Zimmer until his Third Amended Complaint filed in January 2016—well after any of Defendants' alleged adverse action.  See, e.g., Third Am. Compl. ¶¶ 19, 29.  Instead, Plaintiff's earlier pleadings alleged retaliation based solely "for (1) filing this lawsuit and testifying in the case involving DPS Alicea; and (2) his actual or perceived political beliefs and affiliations."  Falco I, 2015 WL 7069653, at *8; see also ECF Nos.

---

alleged knowledge that Plaintiff identified himself as part of "Old Hoboken" suggests knowledge that Plaintiff publicly supported specific candidates who also identified with this "amorphous, non-political group."  Id.

[14] Plaintiff's reliance on evidence tending to show Zimmer's preferential treatment to her political allies is likewise misplaced.  See, e.g., Pl. SSOMF ¶¶ 18, 75-80.  Although "evidence of a pattern of political patronage" is relevant to a claim for retaliation based on political affiliation, Montone v. City of Jersey City, 709 F.3d 181, 192 (3d Cir. 2013), this is not a political affiliation case, see, e.g., id. at 189-95 (analyzing suit for retaliation based on political affiliation and speech as two distinct claims).

1, 29, 58.  Again, Plaintiff must provide evidence that Zimmer knew of his speech in support of candidates in municipal elections, not simply that Plaintiff was generally opposed to Zimmer politically.  Neither the letter from counsel nor the 2013 iteration of this lawsuit more generally provides this.

Fourth, Plaintiff cites his December 2013 testimony in <u>Alicea</u> that he filed this lawsuit based on a belief that Zimmer targeted him because of his "perceived political association with the old guard" and because he was "perceived to be supporting . . . Peter Cammarano" and a candidate for councilperson in the fourth ward.[15]  <u>Alicea</u> Trial Tr. 128:11-129:10.  Plaintiff stopped short of testifying that he actually supported either candidate, but more critically, Zimmer testified that she was not present for Plaintiff's testimony and could not recall any conversations about the substance of the testimony.  Zimmer Dep. Tr. 145:18-146:13.  Plaintiff has pointed to no evidence suggesting that Zimmer was aware of the specific details of his testimony.[16]

Fifth and finally, Plaintiff contends that "common sense" and the speculation of his colleagues demonstrates Zimmer must have known of Plaintiff's political support because of the "small-town" nature of Hoboken politics.  Pl. Opp. at 23-24; <u>see also</u> Lombardi Dep. Tr. 92:5-21 (speculating that Zimmer's layoff plan was "[m]aybe retaliation against [Plaintiff] for cooperating with the union [in its support for Cammarano].  I can't prove it.  It could be an underlying factor.").  This bare assertion is wholly insufficient to support a retaliation claim.  <u>See</u> <u>Michael v. Quaker Valley Sch. Dist.</u>, No. 16-473, 2017 WL 639374, at *9 (W.D. Pa. Feb. 16, 2017) (holding allegation that individual "must have known" about protected speech insufficient to establish retaliation); <u>Keefer v. Durkos</u>, No. 04-187, 2006 WL 2773247, at *14 (W.D. Pa. Sept. 25, 2006)

---

[15] While unnamed, this testimony presumably refers to Occhipinti.

[16] As discussed below, however, the record does contain evidence that Zimmer was aware of Plaintiff's testimony itself, if not its exact substance.

14

(rejecting argument that knowledge can be established by assumption that "people talk in small towns").[17]

The evidence showing Tooke's awareness of Plaintiff's political support is even less substantial. Plaintiff's opposition focuses solely on Zimmer and presents no evidence to refute Tooke's testimony that he did not "identify [Plaintiff] as a political opponent of the mayor." Tooke Dep. Tr. 111:2-12.[18] To the extent Plaintiff seeks to rely on Tooke's proximity to Zimmer in his capacity as DPS, FAC ¶ 66, his argument fails for the reasons discussed above.

For these reasons, a reasonable jury could not conclude that Defendants were aware of Plaintiff's support of Zimmer's opponents in municipal elections. Plaintiff accordingly may not rely on this speech to support his retaliation claim.[19]

### b.    Lawsuit and <u>Alicea</u> Testimony

Unlike Plaintiff's support of political candidates, the record contains evidence that both Tooke and Zimmer had contemporaneous knowledge that Plaintiff initiated this lawsuit and testified in <u>Alicea</u>. Plaintiff named Zimmer in the original Complaint and served her on March 21, 2013. <u>See</u> ECF No. 3. While not initially named himself, Tooke testified that he may have been aware of this lawsuit in 2013. Tooke Dep. Tr. 103:10-14. And each individual Defendant testified to awareness that Plaintiff testified in <u>Alicea</u>. Zimmer Dep Tr. 146:8-13; Tooke Dep Tr.

---

[17] In the same vein, Plaintiff cannot rely on his testimony that Zimmer knew of his support for Occhipinti because Michael Lenz saw Plaintiff at a rally and "in politics when you are against someone and you are out there in the open word gets back." Falco Dep. Tr. 237:17-238:9; <u>see</u> <u>Mawson v. Pittston City Police Dep't</u>, No. 16-400, 2020 WL 6083332, at *5 (M.D. Pa. Oct. 15, 2020) (rejecting argument that one police officer "must have known" about a settlement against the police department and five of its other officers because "officers talk").

[18] Tooke also testified that he was not present for Plaintiff's <u>Alicea</u> testimony, did not discuss Plaintiff's testimony with anyone, and was unaware of the specifics of the testimony. Tooke Dep. Tr. 103:23-104:5, 218:8-11.

[19] Plaintiff has therefore failed to demonstrate Defendants' knowledge of any protected speech prior to the filing of this lawsuit in March 2013. As a result, and discussed in detail <u>infra</u> § III(B)(3), Plaintiff has not shown that his protected speech was a substantial or motivating factor in deprivations that began prior to that time, including the denial of the Uniform and Attendance Benefit, delay of the 1.95% salary increase, and denial of certain accrued compensatory time.

103:20-22.  Plaintiff has therefore, at the very least, demonstrated a dispute of material fact as to whether Defendants were aware of these instances of protected speech during the relevant period.

### 2.   Adverse Employment Action

Defendants next argue that the adverse actions allegedly taken against Plaintiff were de minimis or otherwise insufficient to deter a person of ordinary firmness from exercising his First Amendment rights.  Examining the FAC, the Third Circuit determined that "while some of the withheld benefits, such as the $500 court time and preparation benefit, may be de minimis individually, they collectively rise above the requisite threshold." Falco IV, 767 F. App'x at 313. Defendants urge the Court to reject this position on summary judgment because Plaintiff, in fact, continued to "exercise[] these rights continuously from 2012 until his retirement."  Hoboken Mem. at 25, ECF No. 178.3.  This argument fails at the outset because "whether an act is retaliatory is an objective question."  Mirabella v. Villard, 853 F.3d 641, 650 (3d Cir. 2017) (citation omitted). The relevant inquiry is "not whether the plaintiff was deterred," but rather "whether the act would deter a person of ordinary firmness."  Id.  This is a fact issue for the jury.[20]

### 3.   Causation

Defendants argue that Plaintiff has failed to carry his burden to provide evidence of a causal link between his protected speech and the adverse actions against him.  The Court concludes that there is sufficient evidence in the record to support Plaintiff's assertions of retaliation based on

---

[20] To the extent Defendants argue that Plaintiff's claims based on delayed benefits fail because Plaintiff ultimately received those benefits, the Court disagrees.  This issue was addressed by the Third Circuit.  See Falco IV, 767 F. App'x at 313-14 (permitting Plaintiff to pursue claims for delayed benefits); cf. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 73 (2006) ("[A]n indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay.").

Defendants also argue that Plaintiff did receive a Court Benefit in 2014, but this raises a dispute of material fact that the Court may not resolve on summary judgment.  Hb. SOMF ¶ 52; Pl. RSOMF ¶ 52.

Defendants' denial of the Sandy and Court Benefits and Defendants' delay of the Retirement Benefits. The other aspects of Plaintiff's retaliation claim may not proceed.

To survive summary judgment, Plaintiff must demonstrate either (1) "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action;" (2) "a pattern of antagonism coupled with timing to establish a causal link;" or (3) "evidence gleaned from the record as a whole [from which] the trier of the fact should infer causation." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citation and quotation marks omitted). Relying on the FAC, the Third Circuit held that "the close temporal proximity between [Plaintiff's] protected speech and [Defendants'] withholding the various benefits satisfies the causal component." Falco IV, 767 F. App'x at 314. The Court will therefore examine each alleged deprivation to determine whether the summary judgment record supports the temporal proximity alleged in the FAC, mindful that Plaintiff may no longer rely on his support for candidates opposed to Zimmer to maintain his claim. Rather, Plaintiff must demonstrate a causal nexus between the filing of this lawsuit or his Alicea testimony and each alleged deprivation.

### a. Attendance Benefit, Uniform Benefit, and 2013 Salary Delay

Plaintiff has failed to demonstrate a dispute of material fact as to whether his protected speech was a substantial or motivating factor in Defendants' decision to not award Plaintiff the Uniform and Attendance Benefits from 2012 to 2014. Because Plaintiff did not testify in Alicea nor file this lawsuit until 2013, and because these deprivations each began in 2012, Plaintiff may not rely on temporal proximity to establish his claim. See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1301 (3d Cir. 1997) (affirming judgment as a matter of law where "much of what [plaintiff] characterize[d] as retaliation for her EEOC complaint . . . occurred before she filed the complaint").

17

Moreover, Plaintiff's opposition does not point to any other "evidence gleaned from the record as a whole" that would suggest a causal nexus between the continued nonpayment of these benefits in 2013 and 2014 and either the filing of this lawsuit or the <u>Alicea</u> testimony. <u>Lauren W.</u>, 480 F.3d at 267. Plaintiff refers the Court to scattered evidence purporting to show Zimmer's political animus, such as testimony that Hoboken granted salary increases to certain Zimmer allies. Pl. Opp. at 11-13. However, nothing in the record suggests that having already decided not to award Plaintiff benefits in 2012, Defendants continued this practice in retaliation for Plaintiff's protected speech.[21] <u>See</u> <u>Falco I</u>, 2015 WL 7069653, at *8 (holding that continuing deprivations that began prior to 2013 could not be in retaliation for the filing of this lawsuit).

Plaintiff's claim based on the four-month delay of his 2013 salary increase must fall for the same reason. This alleged deprivation began two months prior to the filing of this lawsuit, <u>see</u> Falco Dep. Tr. 62:18-63:19, and Plaintiff therefore is unable to establish the requisite causal nexus.

### b.   Sandy and Court Benefits

Plaintiff may, however, continue to rely on temporal proximity as to Defendants' nonpayment of the Sandy Benefit in September 2013 and Court Benefit in January 2014. The Third Circuit held that the causal component of Plaintiff's claim was satisfied by allegations that (1) "mere months after he filed the instant lawsuit in March 2013, [Defendants] denied him his Superstorm Sandy stipend in September 2013" and (2) "[Defendants] denied his benefit for court time and preparation in January 2014, less than a month after he testified in <u>Alicea</u> in December 2013." <u>Falco IV</u>, 767 F. App'x at 314. The evidence presented by the parties does not alter this conclusion.

---

[21] To reiterate, Plaintiff also may not rely on evidence tending to show that Zimmer was generally hostile towards members of "Old Hoboken" or displeased with other conduct outside the scope of this lawsuit.

Defendants do not dispute the timing of the above conduct, but argue that Plaintiff cannot establish causation as to the Court Benefit due to Tooke's testimony that he (a) denied payment because Plaintiff did not belong to the PSOA, (b) handled similar requests by Hoboken's Fire Chief in a similar matter, and (c) was never directed to withhold payment due to Plaintiff's Alicea testimony.  Hb. SOMF ¶¶ 47-48, 51.  But though Tooke's testimony certainly creates a dispute of material fact regarding whether his action was retaliatory, it does not prevent Plaintiff from carrying his initial burden to show an "unusually suggestive temporal proximity" sufficient to survive summary judgment.  See Falco IV, 767 F. App'x at 314; Lauren W., 480 F.3d at 267. Plaintiff's claim of temporal proximity to the Alicea testimony is further bolstered by the fact that he received a court time payment in 2012 and 2013, even as Defendants declined to pay other benefits that he formerly received under the PSOA Agreement, such as the attendance incentive and uniform stipend.  See Falco Dep. Tr. 384:16-19.

Defendants likewise have not pointed to anything that would disrupt the temporal proximity between the filing of this lawsuit and the denial of the Sandy Benefit.  Accordingly, Plaintiff may continue to pursue his retaliation claim based on the denial of the Sandy and Court Benefits.

### c.      Retirement Benefits

There are two components to Plaintiff's claim based on the deprivation of his Retirement Benefits.  First, Plaintiff argues that Defendants retaliated against him by delaying payment until several months after his retirement.  In addition to the temporal proximity between Plaintiff's protected speech and this delay, the record evinces a dispute of material fact as to the usual

timeframe for the issuance of retirement checks[22] and the reason for the delayed payment.[23]  This aspect of Plaintiff's claim may proceed.

Second, Plaintiff contends that Defendants still have not disbursed "an unspecified, substantial portion" of amounts allegedly owed to him in accrued compensable time.  Falco IV, 767 F. App'x at 313 (quotation marks omitted); see also FAC ¶¶ 165, 215, 220.  Plaintiff's opposition clarifies his theory of damages.  He argues that New Jersey state law limited his ability to bank unused vacation time to two years,[24] and that Defendants denied Plaintiff a written contract or an explanation of his employment terms.  Pl. Opp. at 30-31.  This, Plaintiff maintains, prevented him from "spending down" his vacation days prior to retirement to end up with exactly two years' time, forcing him to "retire[] with hundreds of compensable days that he was not compensated for."  Id. at 31-32.  Critically, Plaintiff alleges that Defendants began to rebuff his attempts to clarify the terms of his employment beginning in the second half of 2012—prior to the filing of this lawsuit or the Alicea testimony.  FAC ¶ 157; Pl. SSOMF ¶¶ 51-52.[25]  Similar to the Attendance and Uniform Benefits, the timing dooms this portion of Plaintiff's retaliation claim in the absence of additional evidence showing a causal nexus.  Falco I, 2015 WL 7069653, at *8.

---

[22] For example, Tooke testified that retirement payments are typically issued within about 30 to 60 days, Tooke Dep. Tr. 228:18-229:3, while Plaintiff testified that other officers received payments in the first pay cycle after retirement, Falco Dep. Tr. 375:6-11, 536:3-16.  Hoboken first attempted to issue Plaintiff a check representing his retirement compensation on September 10, 2014, or 71 days after Plaintiff's July 1, 2014 retirement.  See Pack Cert. Ex. T.

[23] The Hoboken Defendants attribute the delay to a June 24, 2014 letter Plaintiff sent to Tooke advising that due to the pending lawsuit, all discussions concerning Plaintiff's retirement compensation should run through Plaintiff's attorney.  See Pack Cert. Ex. S.  However, the mere fact that Plaintiff wished to speak through his attorney does not explain why Hoboken waited more than two months and then issued a check directly to Plaintiff.  Moreover, Quentin Wiest—Hoboken's business administrator and the individual who signed the letters issuing Plaintiff's retirement checks—testified that the lawsuit itself factored into the delay, and that he waited to be directed to issue a check after a discussion that involved Zimmer.  Wiest Dep. Tr. 207:18-208:15, Zingaro Cert. Ex. H, ECF No. 185.11.

[24] See N.J.S.A. § 11A:6-3(e) ("Vacation not taken in a given year because of business demands shall accumulate and be granted during the next succeeding year only[.]").

[25] When asked whether he was told that Hoboken would not provide retirement benefits, Falco testified that he understood that he would not receive the benefits granted to other officers based on conversations with Tooke beginning in January 2012.  Falco Dep. Tr. 51:15-54:11.

Plaintiff's reliance on the economic damages expert report prepared by Friedman LLP is similarly unavailing.  See Zingaro Cert. Ex. TT (the "Friedman Report").  With regards to accrued compensable time, the report identifies (based solely on figures supplied by counsel) the compensable days Plaintiff would have been entitled to from June 18, 2009 to July 1, 2014 under the PSOA Agreement or the contracts of previous Chiefs.  Id. at Schedules 3 & 6.  This merely suggests that had Plaintiff been party to an employment agreement, he would have accrued certain time during his tenure.[26]  But Plaintiff had no employment contract, and the denial of a contract is not a viable retaliatory action.  See Falco IV, 767 F. App'x at 313.[27]

Summary judgment is thus warranted as to the reduction of Plaintiff's Retirement Benefits. However, Plaintiff's claim may proceed insofar as it alleges the delayed payment of those benefits.

### C.    Whether Same Actions Would Have Been Taken Absent Protected Speech

As Plaintiff has proffered evidence to support each element of his prima facie case, summary judgment is not appropriate unless Defendants establish as a matter of law that they would have taken the same employment actions with or without the protected speech.  Falco IV, 767 F. App'x at 299 (citing Munroe, 805 F.3d at 466).  Though the Court has already identified disputes of material fact concerning causation, one additional argument raised by Defendants requires further consideration.

---

[26] Moreover, most of the sums claimed in the Friedman Report would not be payable upon retirement even under the PSOA.  For instance, Plaintiff claims a right to payment for accrued "personal days" and "compensatory time," both of which may not accrue or be paid at retirement under the PSOA Agreement.  See PSOA Ag. Art. III(5), (10).  Indeed, the PSOA Agreement states only that accrued vacation days and terminal leave are payable on retirement, and even then, the maximum lump sum payment shall not exceed "a year's salary at the time of the employee's retirement."  Id. at Art. V(3).

[27] Specifically, the Third Circuit held that the temporal gap between Plaintiff's request for a written contract in 2012 and his alleged support of Zimmer's political opponents beginning in 2009 precluded a causal nexus.  Falco IV, 767 F. App'x at 313.  Thus, even if Defendants had knowledge of Plaintiff's political activities, Plaintiff's claim based on the denial of an explanation of his employment terms during the same time period must fall as well.

Defendants argue that Plaintiff was not entitled to unpaid benefits and, therefore, Defendants were legally prohibited from disbursing them and would not have done so.[28]  In support, Defendants rely on two cases arises out of financial distress in the City of Camden for the proposition that a municipality may not legally provide benefits that are unsupported by a statute, ordinance, or contract.  See Hailey v. City of Camden, No. 14-1018, 2017 WL 2656011, at *7 (D.N.J. June 20, 2017); Marini v. City of Camden, No. A-1762-12T4, 2014 WL 4187480, at *10 (N.J. Super. Ct. App. Div. Aug. 26, 2014).   The Court disagrees, however, that these cases precluded Hoboken from awarding certain benefits to Plaintiff.  Rather, they suggest only that if Hoboken did decide to provide benefits, it was required to formalize that arrangement with a contract.  See Marini, 2014 WL 4187480, at *10 (rejecting fire chief's claim that he was entitled to compensatory time under an "implied contract" with the city); Hailey, 2017 WL 2656011, at *7 (finding that business administrator's ratification of compensatory time unsupported by ordinance, statute, or contract was ultra vires and unlawful).[29]  This says nothing about whether Hoboken would have behaved similarly absent the protected speech.

Consequently, Defendants have not established as a matter of law that they would have taken the same employment actions absent Plaintiff's protected speech.

---

[28] Plaintiff's lack of entitlement to the unpaid benefits does not, by itself, preclude his First Amendment claim.  "[T]he government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit."  Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr, 518 U.S. 668, 674 (1996) (citing Perry v. Sindermann, 408 U.S. 593, 597 (1972)) (quotation marks omitted) (emphasis added).

[29] Regardless, the Court is unpersuaded that the current record demonstrates that Defendants lacked the legal ability to provide the benefits at issue.  Manifestly, Defendants were permitted to pay Plaintiff's Retirement Benefits, as they ultimately did so.  See Pack Cert. Ex. T.  Similarly, any claim that Defendants could not issue Plaintiff a Court Benefit in 2014 is belied by the fact that Defendants awarded Plaintiff this benefit every year until 2013, and indeed argue that Plaintiff received it in 2014 as well.  Falco Dep. Tr. 384:16-19; Hb. SOMF ¶ 52.  Finally, while the record is largely devoid as to the circumstances surrounding the Sandy Benefit, logic dictates that if Hoboken could decide to issue an extra benefit to the rank and file of the HPD, it could have decided to issue the same benefit to Plaintiff.

###### D.       Individual Liability and Qualified Immunity

Zimmer argues that even if the Hoboken Defendants took adverse actions against Plaintiff, she was not involved in those decisions and cannot be held personally liable.  The Court disagrees.

An individual is liable under Section 1983 only if she "individually participated in the alleged constitutional violation or approved of it."  C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005) (citation omitted).  Here, the record contains a dispute of material fact concerning Zimmer's participation in the employment decisions at issue.  For example, Quentin Wiest testified that he delayed issuing Plaintiff's Retirement Benefits because he was waiting for direction after a discussion that involved Zimmer.  Wiest Dep. Tr. 207:18-208:15.[30]  Zimmer confirmed that while she was not involved with the calculation of Plaintiff's retirement compensation, she did have a discussion with Wiest about the payment of those benefits.  Zimmer Dep Tr. 218:11-219:7. Zimmer also testified that she spoke with Tooke about Plaintiff's request for compensation related to Superstorm Sandy.  Id. 177:21-178:9.  While far from conclusively establishing Zimmer's participation, these facts are sufficient to withstand the instant Motions.[31]

Separately, Defendants argue that Zimmer and Tooke are each entitled to qualified immunity.  Qualified immunity shields "government officials performing discretionary functions" from civil damages unless their conduct "violate[d] established constitutional rights of which a reasonable person would have known."  Roberts v. Mentzer, 382 F. App'x 158, 166 (3d Cir. 2010) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The Court must undertake a two-pronged

---

[30] Wiest also testified to a more general understanding that Zimmer viewed the compensation of Hoboken's directors, police chief and fire chief as "hers to decide . . . on a case-to-case basis."  Wiest Dep Tr. 80:20-82:4.

[31] The Hoboken Defendants concede that Tooke was personally involved in the personnel decisions involving Plaintiff. See, e.g., Hb. SOMF ¶¶ 50, 54-55.  Plaintiff's claim against Hoboken may proceed as well, as Defendants do not dispute that Tooke and Zimmer are high-ranking officials whose decisions can bind the city under Monell v. N.Y.C. Dept. of Social Servs., 436 U.S. 658 (1978).  See City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988); see, e.g., Zimmer Dep. Tr. 174:14-25 (testifying that Tooke had authority over policy decisions concerning the police department, including compensation decisions).

objective inquiry that asks (1) "whether the facts that [the] plaintiff has alleged . . . make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." Kedra v. Schroeter, 876 F.3d 424, 434 (3d Cir. 2017) (quoting Pearson v. Callahan, 555 U.S. 223, 232 (2009)).

The Third Circuit has held that the facts alleged by Plaintiff make out the violation of a constitutional right, Falco IV, 767 F. App'x 294, and Defendants do not dispute that the rights asserted by Plaintiff are clearly established.[32] Rather, Tooke and Zimmer argue they are entitled to qualified immunity because they acted in good faith and did not intentionally violate Plaintiff's constitutional rights. The question of the individual Defendants' retaliatory intent goes to the heart Plaintiff's retaliation claim, and so "to the extent that [Plaintiff has] made a showing sufficient to overcome summary judgment on the merits, [he has] also made a showing sufficient to overcome any claim to qualified immunity." Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001). The application of qualified immunity is inappropriate at this stage.

### E.      Punitive Damages

Lastly, Defendants argue that summary judgment is appropriate on Plaintiff's claim for punitive damages because Plaintiff has failed to provide evidence of "reckless or callous indifference" of constitutional rights or "evil motive or intent." See Smith v. Wade, 461 U.S. 30, 56 (1983). The Court agrees.

As a threshold matter, municipalities and individuals sued in their official capacity are immune from punitive damages under Section 1983. See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981) (municipalities); Rivera v. Zwiegle, No. 13-3024, 2014 WL 6991954, at

---

[32] See, e.g., Green, 105 F.3d at 888-89 (holding that "all court appearances" by a public employee are protected speech absent an adequate justification by the employer).

*7 (D.N.J. Dec. 9, 2014) (official capacity suits).  Summary judgment is therefore warranted on Plaintiff's claim to the extent it seeks punitive damages against Tooke and Zimmer in their official capacities or against Hoboken itself.

Punitive damages may, however, be assessed against an official sued in her individual capacity.  In a Section 1983 retaliation case, punitive damages are available only where the plaintiff provides evidence that the defendant acted with "heightened culpability, above and beyond a retaliatory motive."  Eichenlaub v. Twp. of Indiana, 214 F. App'x 218, 224 (3d Cir. 2007); see also Brennan v. Norton, 350 F.3d 399, 429-30 (3d Cir. 2003) ("[P]unitive damages require more than the retaliatory motive itself.").  This burden has been deemed satisfied where, for example, there is evidence of "unusual procedures" directed solely at the plaintiff, coupled with "substantiated evidence of the defendant's vindictive attitude towards the plaintiff."  Eichenlaub, 214 F. App'x at 224 (citing Springer v. Henry, 435 F.3d 268, 281-83 (3d Cir. 2006); see also DeLuzio v. Monroe Cnty., 271 F. App'x 193, 198 (3d Cir. 2008) (holding that punitive damages were supported by testimony concerning defendant's "ongoing hostility," and "improper negative evaluations" prior to plaintiff's termination and interference with plaintiff's ability to seek other employment after termination).  On the other hand, "unsubstantiated allegations" of ill intent are insufficient.  Eichenlaub, 214 F. App'x at 224.

The record contains a dispute of fact as to whether Plaintiff was individually subjected to "unusual procedures," such as the timing of his retirement payment relative to other officers.[33] Unlike in Springer or DeLuzio, however, the record is bereft of substantiated evidence showing that Zimmer or Tooke acted vindictively towards Plaintiff or exhibited "ongoing hostility" as a result of Plaintiff's filing this lawsuit or testifying in Alicea.  Plaintiff's retirement payment,

---

[33] See supra notes 22 and 23.

though delayed for two months, was paid by September 2014.  The denials of the Sandy Benefit (five days of compensatory time) and the Court Benefit ($500) are also not supported by evidence of "evil motive or intent" or "reckless or callous indifference" of rights.  Indeed, the only evidence cited by Plaintiff concerning Zimmer's or Tooke's attitude towards Plaintiff relates either to (a) Zimmer's general disposition towards members of "Old Hoboken" and the police unions, rather than towards Plaintiff himself, see, e.g., Pl. SSOMF ¶¶ 9-13, 19-21, 29, or (b) conduct that is outside the scope of this lawsuit and occurred prior to Plaintiff's viable instances of protected speech, see, e.g., id. ¶¶ 20-31 (reaction to proposed budget and layoff plan in 2010); id. ¶ 35 (reaction to Plaintiff's planned attendance at an April 2011 community meeting); id. ¶¶ 59-62 (reaction to arrest of Ian Sacs in March 2011); id. at ¶¶ 51-52 (failure to sign a written contract governing Plaintiff's employment in mid-2012).

In the absence of additional evidence showing Defendants' "evil motive or intent" or "reckless or callous indifference" of Plaintiff's right to file this lawsuit and testify in open court, the record does not support a claim for punitive damages.  While the evidence of temporal proximity discussed above is sufficient to withstand the instant Motions as to Defendants' liability, it does not provide evidence of "heightened culpability, above and beyond a retaliatory motive." See Eichenlaub, 214 F. App'x at 224.  The Court thus enters summary judgment in favor of Defendants on Plaintiff's claim for punitive damages.

**V.   CONCLUSION**

For the reasons stated above, Defendants' Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56, ECF Nos. 178 & 179, are **GRANTED in part** and **DENIED in part**.  Plaintiff's claim may proceed only to the extent it alleges that Defendants (1) withheld a "Superstorm Sandy" stipend in September 2013; (2) withheld a court time payment in January

2014; and (3) delayed payment of Plaintiff's retirement benefits, in retaliation for (a) Plaintiff's filing of this lawsuit; or (b) Plaintiff's testimony in the <u>Alicea</u> matter.  Partial summary judgment in favor of Defendants is granted as to the remainder of Plaintiff's retaliation claim and his demand for punitive damages.

Date: December 28, 2020               **<u>/s/ Madeline Cox Arleo</u>**
                                      **Hon. Madeline Cox Arleo**
                                      **UNITED STATES DISTRICT JUDGE**